DOUGLAS CLEMENTS and SUE CLEMENTS, Appellants, v. AIRPORT AUTHORITY OF WASHOE COUNTY, Respondent.

No. 23025

May 25, 1995 896 P.2d 458

---

*Lynn G. Pierce*, Reno, for Appellants.

*Walther, Key, Maupin, Oats, Cox, Klaich & LeGoy*, Reno, for Respondent.

## OPINION

By the Court, Rose, J.:

Appellants Douglas Clements (Douglas) and Susan Clements (Susan) were employed by the respondent Airport Authority of Washoe County (AAWC). Susan and Douglas were terminated by the Executive Director of the AAWC following reorganization of the AAWC, and the AAWC Board of Trustees (the Board) sustained these terminations. Because Susan was a civil servant protected by the provisions of the AAWC civil service plan, she should have been transferred to another position in lieu of termination, in accordance with plan provisions. Douglas, however, was not a civil servant and was properly terminated.

### FACTS

In 1986, Susan was hired by the AAWC Property Management Department (Properties). At the time she was terminated, Susan held the position within Properties of Advertising/Marketing Specialist. Douglas was hired as AAWC Chief of Planning, Engineering, and Maintenance (PEM) in December, 1985.

On April 6, 1989, the Board approved a reorganization plan submitted to it by its Executive Director, Robert White (White). White became the Executive Director of the AAWC in November, 1988, following the resignation of the predecessor Executive Director after allegations of misconduct. Shortly after White became the Executive Director, he commenced planning the reorganization of the AAWC "to create an efficient operation." The reorganization, as passed by the Board, involved the termination of both Susan and Douglas. White personally chose Susan

as the employee in her department to be laid off, and the reorganization plan, developed by White, specifically targeted Douglas's position as Chief of PEM for termination.

Douglas and Susan each filed a grievance protesting their termination, and separate grievance hearings were held for both Douglas and Susan before three-member grievance panels. The grievance panels unanimously found that the AAWC violated its own Personnel Policies and Procedures Manual (the Manual), setting forth the AAWC civil service plan, by wrongfully terminating Douglas and Susan, and that Douglas and Susan should have been offered positions within the AAWC in lieu of termination.

White, claiming power of review over the grievance panels' decisions under Manual section 7.1D, unilaterally reversed the decision of both panels, finding that he properly terminated Susan and Douglas. White concluded that the grievance panels' decisions were not compatible with personnel policies, to wit: (1) that Douglas, as a department head, was an at-will employee, unprotected by the provisions of the Manual, and (2) that Susan was a professional employee, also unprotected by the provisions of the Manual.

The Board, which may review the decision of a grievance panel or the Executive Director, and whose decision is the final and binding agency decision, affirmed White's decision. As to Douglas, the Board determined that White had jurisdiction to render his decision, that Douglas was an at-will employee, and that White did not err in reversing the decision of the grievance panel. As to Susan, the Board determined that she was a professional employee, and that she was therefore not entitled to the protections of the Manual, and that White did not err in reversing the decision of the grievance panel.

Douglas and Susan apparently claimed before the grievance panel that their terminations were the result of exercising their lawful rights to report improper activity. However, both grievance panels determined that it was not the proper forum to make this determination. The findings of fact, conclusions of law, and decision of the Board give no indication that the issue of retaliatory firing was considered, except a very general determination that Douglas and Susan were provided with due process in their terminations.

Douglas and Susan filed a complaint styled as a petition for judicial review in the district court asking that the decisions of the Board be reviewed because they were clearly erroneous, arbitrary, and capricious, represented an excess of authority, and were an abuse of discretion. There was no cause of action for retaliatory firing or claim that Douglas and Susan were termi-

nated because of exercising their right of free speech in reporting improper activity. The Clements' brief to the district court did claim that the reorganization was a subterfuge to get rid of Douglas and Susan because they had reported improprieties of a prior Executive Director. However, no amendment to the complaint was requested by the Clements to assert retaliatory firing or termination in violation of Nevada's public policy. Accordingly, the district court determined that substantial evidence and the policy and procedures manual supported the Board's terminations of Douglas and Susan, and the court specifically addressed the claim of retaliatory firings.

> Petitioners argue that their discharge was in retaliation of their coming forward and offering information concerning improprieties by the previous Director. This is an issue not addressed in the Board of Trustees' decision and, thus, not an issue properly before this Court at this time.

The record before the district court also contained Douglas and Susan's complaint in the United States District Court filed April 12, 1991. In this pleading, the Clements claim that jurisdiction of the court rested on 28 U.S.C. § 1331 (1988) and reiterated their claim of retaliatory discharge. The complaint specifically noted that the grievance panel declined to rule on the issue of retaliatory discharge because it was beyond the scope and authority of the grievance panel. The Clements then went on to claim that their termination violated the United States Constitution and Nevada law, that the termination was without cause and breached the implied covenant of good faith and fair dealing, that the termination constituted a violation of Nevada's public policy because it was a retaliatory discharge, and that they suffered the infliction of emotional distress.

*Standard of Review*

This court's role in reviewing an administrative decision is identical to that of the district court: to review the evidence presented to the agency in order to determine whether the agency's decision was arbitrary or capricious and was thus an abuse of the agency's discretion. Titanium Metals Corp. v. Clark County, 99 Nev. 397, 399, 663 P.2d 355, 357 (1983); *see* NRS 233B.135[1]; State Envtl. Comm'n v. John Lawrence Nev., 108

---

[1]NRS 233B.135 provides that judicial review of a final agency decision must be confined to the record and the burden of proof is on the party challenging the agency decision. NRS 233B.135(1), (2). NRS 233B.135(3) provides:

> 3. The court shall not substitute its judgment for that of the agency

Nev. 431, 433-34, 834 P.2d 408, 410 (1992). "Administrative agencies may receive and weigh evidence and a reviewing court may not substitute its judgment on questions of fact." Southwest Gas v. Woods, 108 Nev. 11, 15, 823 P.2d 288, 290 (1992) (citations omitted). On questions of fact, this court is limited to determining whether substantial evidence exists in the record to support the administrative agency's decision. *See* SIIS v. Swinney, 103 Nev. 17, 20, 731 P.2d 359, 361 (1987). Although a reviewing court may decide pure legal questions without deference to an agency determination, an agency's conclusions of law which are closely related to the agency's view of the facts are entitled to deference and should not be disturbed if they are supported by substantial evidence. SIIS v. Khweiss, 108 Nev. 123, 126, 825 P.2d 218, 220 (1992). Substantial evidence is " 'that quantity and quality of evidence which a reasonable [person] could accept as adequate to support a conclusion.' " State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608 n.1, 729 P.2d 497, 498 n.1 (1986) (quoting Robertson Transp. Co. v. P.S.C., 159 N.W.2d 636, 638 (Wis. 1968)).

The dissent of JUSTICE SHEARING states that only those determinations that are specifically within the administrative agency's ken or expertise are entitled to deferential review. While we have no major quarrel with this observation, we note that no such distinction is made in NRS 233B.135 or in our prior case law. Further, we believe that decisions involving the intricacies of an agency's operation and procedures are entitled to some deference by this court. However, given the issues and record on appeal in this case, we would reach the same result without giving any deference to the Board.

## AAWC Creation and the Manual

The AAWC was created by the Legislature in 1977, under Chapter 474 of the 1977 Statutes of Nevada (the Act), as a quasi-

---

as to the weight of evidence on a question of fact. The court may remand or affirm the final decision or set it aside in whole or in part if substantial rights of the petitioner have been prejudiced because the final decision of the agency is:

(a) In violation of constitutional or statutory provisions;

(b) In excess of the statutory authority of the agency;

(c) Made upon unlawful procedure;

(d) Affected by other error of law;

(e) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(f) Arbitrary or capricious or characterized by abuse of discretion.

municipal corporation. 1977 Nev. Stat., ch. 474, § 4 at 969. Section 29 of the Act authorized the AAWC to adopt its own civil service plan to be administered by the AAWC Board. 1977 Nev. Stat., ch. 474, § 29 at 975. The Manual sets forth the civil service system as adopted by the AAWC. Therefore, any protections provided to AAWC employees by the Manual apply only to those employees covered by the Manual, i.e., those employees within the civil service system.

In addition to being excluded from the civil service system by the express provisions of the Manual, an employee may also be excluded from the civil service system by the provisions of section 29 of the Act. Under section 29(13), "persons employed to render professional, scientific, technical or expert service, [and] persons providing services of a temporary or exceptional character" are mandatorily exempt from the AAWC civil service plan. 1985 Nev. Stat., ch. 494, § 3 at 1513. Those included within the AAWC civil service plan may be entitled to protection from termination by Manual section 9.2, which states:

> When necessary to reduce the number of employees in any job classification, it is the policy of the Airport Authority whenever possible to attempt to minimize lay-offs by readjustment of personnel through transfer, if qualified, to other open positions within the Authority. It is further policy that whenever lay-offs are necessary, temporary and probationary employees in that job classification shall be laid off before permanent employees. Permanent employees shall be laid off in inverse order of their length of service by job classification.

### Douglas's Claims

Douglas contends that he was included within the AAWC civil service plan, and that he was therefore entitled to protection from termination by section 9.2 of the Manual. The reorganization plan called for the termination of the Chief of PEM position and the creation of a corresponding Senior Engineer position. The job duties of the Senior Engineer were to be either identical to or scaled down from those of the Chief of PEM, with the only new requirement being that the Senior Engineer must be a registered engineer, which Douglas was. Douglas asserts that, under section 9.2 of the Manual, he was entitled to a transfer to the Senior Engineer position in lieu of termination.

Section 2.4(O) of the Manual provides, "The Associate Director, department heads and Executive Secretaries are hired by and serve at the pleasure of the Executive Director." As the Chief of

PEM, Douglas was a department head and served at the will of the Executive Director. As such, by the terms of the civil service plan as set forth in the Manual, Douglas was not entitled to the job protections afforded to regular civil service employees under the Manual, such as job reassignments. Instead, Douglas served at the pleasure of White and he may not now complain of his termination by White. Since Manual section 2.4(O) excluded Douglas from the civil service system, Douglas had no right to be transferred to the Senior Engineer position when his previous position was eliminated.

The dissent of JUSTICE SPRINGER reaches a contrary conclusion. The dissent focuses on an issue not properly before this court on appeal, i.e., a potential claim against the AAWC for retaliatory termination. The grievance panel, however, refused to consider any issues relating to retaliatory dismissal, as did the Board in reversing the panel's decisions. Indeed, it may have been improper for the grievance panel to attempt the resolution of any controversy other than one involving the interpretation of provisions of the civil service system. Issues of retaliatory dismissal were also not addressed by the district court because they were not pled. The sole issue before the grievance panel, the Board, and the district court was whether the AAWC violated the AAWC's Manual in terminating Douglas without offering to transfer him to another position within the AAWC. Whether Douglas's termination was wrongful for any other reason is beyond the scope of our review because the issue was not specifically pleaded in the complaint filed in state district court or litigated by the parties. *Cf.* Idaho Resources v. Freeport-McMoran Gold, 110 Nev. 459, 874 P.2d 742 (1994). Even Douglas's counsel on appeal acknowledges that issues of retaliatory dismissal are not before this court on this appeal.

The issue of retaliatory firing was specifically contained in the federal district court complaint, and the record supports the state district court's determination that the retaliatory firing issue was not properly before it. It is clear from the record that Douglas and Susan elected to litigate the retaliatory firing issue in the federal court system.

Douglas's counsel on appeal also does not assert that Douglas was not a department head, and in fact, his counsel implicitly acknowledges that Douglas was a department head. Douglas has therefore not demonstrated to this court that there is any disputed issue of fact as to whether he was a department head, and the dissent's reliance on Douglas's status as a department head as a disputed issue of fact is misplaced.

*Susan's Claims*

Susan also contends that, under section 9.2 of the Manual, she should not have been terminated. As with Douglas, whether Susan was protected by the provisions of the Manual depends, in part, on whether she fell within the civil service system. On review, the Board determined that Susan was a professional employee, and that she was therefore excluded from the civil service plan and from the protections of the Manual by section 29(13) of the Act. The district court also found Susan to be a professional employee, and thereby excluded from the civil service system.

Although evidence was presented at the grievance hearing indicating Susan was considered by AAWC personnel to be a professional employee, we are not bound by any administrative or bureaucratic label affixed by the AAWC. Instead, we must examine section 29(13) to determine whether a person in Susan's position was meant by the Legislature to be included within the definition of one who provides professional services.

We conclude that Susan was not a professional employee within the meaning of section 29(13).[2] She had no special skills which she brought to the job. She moved into the Properties department from her position as a secretary. She did not have a college degree, a special license, or any formal certification. If she were considered to have been employed to render "professional, scientific, technical or expert service[s]," then every mid-level employee of the AAWC would be exempt from the civil service system, as Susan had absolutely no special or professional skills. NRS 89.020(4) defines "professional service" as "any type of personal service which may legally be performed only pursuant to a license, certificate of registration or other legal authorization." This definition seems consistent with section 29(13), which groups professional services with such other specialized skills as scientific, technical, or expert services. We conclude that section 29(13) was intended to exclude from the civil service system persons acting more as consultants than regular employees, and that Susan in no way fit within the civil service exemption in section 29(13). Therefore, the civil service protections encompassed within the Manual apply to Susan.

---

[2]The AAWC admitted before this court that it applies certain provisions of the Manual to those it considers to be "professional" employees. The AAWC's definition of a "professional" employee must therefore differ from that of section 29(13), which, by statute, excludes "professional" employees from the provisions of the Manual.

Since we conclude that Susan fell within the civil service system, we must determine whether section 9.2 of the Manual entitled her to an interdepartmental transfer in lieu of termination. Susan contends that, under section 9.2 of the Manual, she could not be terminated prior to a probationary employee in Properties, who also had less seniority. The AAWC asserts that section 9.2 does not apply here because Susan's classification within Properties was one step below the other three employees in the department. Since section 9.2 only provides for termination in inverse order of seniority within a job classification and for initial termination of probationary employees within a job classification, the AAWC argues that Susan was not entitled to have anybody terminated before herself. The Board concluded that Susan's position in Properties was of a different classification than the other three Properties positions, and it stated, "Even if civil service rules apply, [Susan] Clements' job classification was eliminated, thus giving her no 'bumping rights' under the layoff procedure in section 9.2 of the Manual." The district court reached the same conclusion.

Prior to the reorganization, Properties maintained four staff positions: two Property Management Analysts, a Property Acquisition Specialist, and Susan's position of Advertising/Marketing Specialist. The reorganization left Properties with three staff positions under a single job description of Property Administrator, which encompassed the duties of the former positions under the titles "Property Administrator," "Property Administrator/ Advertising," and "Property Administrator/Acquisition." The functions of the Properties department did not change with the reorganization. The issue becomes whether all four positions in the Properties department prior to reorganization were in the same AAWC job classification, or whether Susan's position as Advertising/ Marketing Specialist was of a different classification than the other three positions.

Manual section 1.11 states, in pertinent part:

> Position classification is a process of identifying and describing the different kinds of work being performed in an organization and allocating jobs into classes based on similar or like duties, responsibilities and qualification requirements.

Evidence was received at Susan's grievance hearing that the written duties, responsibilities, and qualifications of the four Properties positions, including Susan's, were similar, and that Susan was capable of performing most if not all of the duties in the property management area. The same pay scale was also used

for all four Properties positions. The Chief of Properties, Susan's immediate supervisor, testified that the Property Management Analyst and the Advertising/Marketing Specialist were within the same job classification. Furthermore, while the AAWC argued that the Advertising/Marketing Specialist position was separate and distinct from the rest of Properties, Susan was being cross-trained to perform all of the duties within the Properties department.

Evidence was also received at the grievance hearing that, following reorganization, Susan was qualified to be a Property Administrator, and that 99.9 percent of the work formerly done by Susan was done within the new Properties department. The fact that the newly created position of Property Administrator was meant to encompass all four of the previous Properties positions in a single job also indicates that Susan's position was not significantly different from the others.

In sum, there was not substantial evidence to support the Board's determination that Susan's job classification was different from that of the other three employees in Properties. On the contrary, the evidence suggests that all the positions within the Properties department were of the same job classification. Accordingly, pursuant to Manual section 9.2, the probationary employee with less seniority should have been terminated prior to Susan, and Susan should have been offered one of the newly created Property Administrator positions. We reach the same conclusion concerning Susan's claim of retaliatory firing as we did with Douglas's similar assertion and conclude that it is without merit.

## CONCLUSION

The Board did not err in sustaining the AAWC's termination of Douglas, but the Board erred in sustaining the AAWC's termination of Susan. We have carefully considered all other contentions on appeal; and we conclude that they either lack merit or need not be further addressed in light of our disposition.

Accordingly, we affirm that portion of the district court's order denying judicial review as to Douglas and upholding the Board's decision sustaining Douglas's termination. We reverse that portion of the district court's order denying judicial review as to Susan and upholding the Board's decision sustaining Susan's termination; and we remand this case to the district court with instructions to direct the Board to reinstate Susan and afford her all rights accorded by the Manual, in particular those rights under Manual section 9.2.

STEFFEN, C. J., and YOUNG, J., concur.

SPRINGER, J., concurring in part and dissenting in part:

I concur in the judgment reinstating Sue Clements in her employment with the Airport Authority, but I disagree with the majority opinion's denial of relief to Douglas Clements.

The record tells me that Douglas was probably unjustly terminated and that Director White and his overly-compliant board reorganized the entire Airport Authority just to get rid of Douglas because he was a threat to the *status quo*—he was a whistle-blower, who was calling attention to irregularities and illegalities on the part of the Airport Authority administration.

Douglas makes out a rather clear case of retaliatory discharge; but because the trial court refused to deal with this claim, I will direct my attention first to the more obvious and uncontestable reason why Douglas should be reinstated, and that is because a duly-constituted Grievance Panel heard Douglas' grievance and properly decided that he was entitled to his keep his job under the so-called "reorganization" of the Airport Authority, which he claims was devised solely to get rid of him and other suspected whistle-blowers. After discussing Douglas' right to employment by the "reorganized" Airport Authority; I will discuss the invalidity of the Airport Board's unlawful decision to get rid of Douglas in retaliation for his being perceived as a "whistle-blower."

## I.

### UPHOLDING THE GRIEVANCE PANEL

It must always be kept in mind that Douglas was not *fired*; he was laid-off in a reduction of force. He was not summarily terminated as an "at-will" employee, nor was he dismissed for cause. It is clear that Director White considered Douglas subject to termination only through appropriate "disciplinary action" or as an incident to a reduction in force. Director White made this clear to Douglas in his April 21, 1990, letter to Douglas in which he wrote that it "must be clearly understood that this *reorganization and reduction of force,* as it affects your *prior* position is not a *disciplinary action*" (Emphasis added.) After the Grievance Panel reinstated Douglas, the Authority tried to characterize Douglas as an at-will employee subject to groundless, summary dismissal, but this position was taken in a last-minute, after-the-fact attempt by White and the Airport Authority Board to justify its decision to deny Douglas his right under the personnel manual to continue in his "prior position."

Douglas successfully persuaded the Grievance Panel that under the terms of the reorganization crafted by White, Douglas was entitled to continued employment in a position comparable to his "prior position," namely, the newly-named position of "Senior

Engineer." As recited in the Board's Findings of Fact, "the three member [Grievance] panel issued its decision finding that the Authority violated its Personnel Policies and Procedures Manual when it failed to offer Douglas the position of Senior Engineer in lieu of laying him off." The Grievance Panel made its holding in accordance with the Airport Authority's official personnel policies and procedures, which disfavored job losses when lay-offs became necessary and which encouraged "readjustment of personnel through transfer, if qualified, to other open positions within the authority." When the Authority changed the title of Douglas' position to that of "Senior Engineer," there was no one around who was more suited to fill the newly-named position than its former holder, Douglas Clements; and the official personnel policy of the Authority dictated that he continue his job under its new name. There was, of course, no way that supposed whistle-blower Douglas was going to be allowed to stay on the job; so, in violation of Airport Authority policy, he was refused continued employment with the Authority.

In the scramble to find an excuse for getting rid of Douglas, the Authority gave Douglas two different reasons for getting rid of him. In its review of the Grievance Panel, the Authority's Findings of Fact recite that Douglas was "terminated on April 7, 1989 pursuant to a Plan of Reorganization and Reduction of Force." If this were the real reason for Douglas' termination, then, under Section 9 of the official personnel policies and procedures, he would be entitled to continue his employment under the new title of "Senior Engineer." In the very same Findings of Fact, however, the Authority claimed also that Douglas was "an at-will employee" and that he could, therefore, be "terminated at the pleasure of the Executive Director." The position of the Authority seems to be, then, that it laid-off Douglas as part of a reduction of force; but, if that does not work, the Executive Director had the right to fire him anyway because he was an at-will employee. I submit that the Authority cannot have it both ways: it either laid him off or it fired him. It is clear from the record that Douglas was not fired by the Executive Director as an at-will employee (The Authority did not assert this "at-will" argument until after Douglas' lay-off) and that Douglas was in fact laid-off under the excuse that there was a necessary reduction of force. This being the case, Section 9 of the policy manual requires that he be given preference for the new Senior Engineer position. This is exactly what the Grievance Panel correctly ruled. I cannot imagine how the district court failed to see the obvious injustice inherent in the way that both the Executive Director and the rubber-stamp Board appears to have trampled on Douglas' employment rights.

The majority opinion adopts the Airport Authority's fall-back argument, position number two, that Douglas was an at-will employee who "served at the pleasure of White" and that, therefore he was not a civil service employee and not entitled to his rights under the reduction in force provisions of the employment manual. If White had really considered Douglas to be an at-will employee, all White had to do was fire Douglas and get on with it. White did not do this; instead, he went about contriving what appears to me to be an elaborate subterfuge for dismissing Douglas. White himself made it very clear to Douglas that he was not firing him, but that Douglas was, rather, the unfortunate victim of a reduction of force that was necessary "for a more efficient operation."

Even if I were to agree with the majority that Douglas was subject to being fired at the pleasure of the executive director,[1] the issue of whether Douglas was or was not an at-will employee was never brought up as a basis for dismissing him until this matter got to the stage where the Authority Board was reviewing the decisions of the Grievance Panel and of its executive director. It was not until September 7, 1989, five months after he had been laid-off for the supposed "reduction of force," that the Authority raised the "at-will" issue and urged that Douglas could be "terminated at any time without cause." As far as Douglas was concerned, up until the aforementioned Board action, he was acting under the assumption that the only issue to be resolved was whether he was entitled to be transferred to the Senior Engineer position, as decreed by the Grievance Panel. For the Authority to say, all of a sudden, that Douglas was not eligible to be considered for the Senior Engineer position because he supposedly was an at-will employee at the time that "prior position" had been eliminated, is so far out of touch with the earlier proceedings and so far out of touch with reality as to have serious due process implications. Douglas was not defending against summary at-will dismissal, he was defending against the Authority's refusal to give him the Senior Engineer position that, under the personnel

---

[1]The sole basis for the Authority's claim that Douglas served at the pleasure of the director is that he was, before his job was abolished, a "department head." The term "department head" is not defined in the manual, and Douglas was not given any opportunity to challenge the contention that he was, as a department head, an at-will employee. If it made any difference to the outcome of this case, I would argue that Robert Esperance, Director of Operations, was the head of the department in which Douglas was employed; however I do not see that it makes any difference whether Douglas was a department head or not. Whatever he was, he was not dismissed as an at-will employee; his job was eliminated, and he was entitled under Section 9 of the manual to be transferred to the new "Senior Engineer" position, which clearly was not a "department head."

manual, he was entitled to. Further due process problems are presented by the fact that the Grievance Panel decision was nullified by a stroke of the pen of Director White, whose very decision the Grievance Panel was reviewing. It appears that when the Grievance Panel overturned White's decision to refuse the position to Douglas, White simply nullified the Grievance Panel's ruling. Ordinarily, decision-makers are not permitted to reverse the action of the appellate tribunal which is responsible for reviewing their decisions; and I find it to be quite extraordinary that White was able to nullify the Grievance Panel's decision relating to his administrative ruling.

The contention that Douglas was an at-will employee rather than a civil service employee is a new one and one that Douglas was never given an opportunity to oppose. When Director White wrote to Douglas on April 21, 1989 (two weeks after Douglas was laid-off), he advised Douglas that the Authority would accommodate his request to pursue the grievance process in accordance with the Airport Authority Personnel Policies and Procedures Manual. Obviously White thought that Douglas was entitled to the review procedures set forth in the manual. When Douglas was hired, he was given the manual and other documents which established his civil service status; and even if his abolished position were considered to be management-related, rights and obligations of managers are provided for in the manual.

There is testimony in the record from the Authority's former chief of human resources that all Authority personnel were part of the classified system and that the manual was designed to apply to all non-contract employees, including managers and supervisors. I would note further that the Grievance Panel made an express finding of fact that the Personnel and Procedures Manual granted civil service status to Douglas. I see no question relating to Douglas' civil service status, nor to his right to be appointed to the "new" job classification. I see no reason why the decision of the Grievance Panel should not be upheld.

## II.

### "RETALIATORY LAY-OFF"

Douglas raised two issues in the grievance proceedings, the first being that his layoff amounted to a retaliatory discharge and secondly that Authority's refusal to "rehire" him violated the Authority's Policy and Procedures Manual. The grievance panel issued a unanimous decision holding that the Authority violated its own Personnel Policy and Procedures Manual when it failed to offer Douglas the position of Senior Engineer in lieu of permanent layoff. The Grievance Panel decreed that Douglas was entitled under the manual to be appointed as Senior Engineer; and the

Panel, given its ruling that Douglas was entitled to continue in his newly-entitled position, implicitly decided that it was unnecessary to rule on Douglas' other claim, that of retaliatory dismissal. As I see it, even if the district court had been justified in refusing to uphold the Grievance Panel's decision, the district court still should have considered the retaliatory nature of Douglas' termination and should have granted judicial review on the basis of the groundless and arbitrary nature of the Authority's retaliatory termination of an employee who claimed that he was refused employment solely because he had reported "financial wrongdoing" on the part of agents of the Authority. The trial court declined to consider the arbitrary and retaliatory nature of Douglas' termination just because this issue "was not addressed by the Board of Trustees' decision, and thus, [was] not an issue properly before this Court at this time." (In other words, because the trustees declined to deal with these unpleasant matters, the court would not consider them either.)

The majority mentions that Douglas has a tort action based on retaliatory discharge pending in the federal court. I cannot imagine what this fact has to do with the present action. In the present state action, Douglas is merely maintaining that White's refusal to appoint him as Senior Engineer was improperly motivated and based on White's fear of Douglas as a whistle-blower. If this allegation is true, it reveals a startling abuse of official power by White and by the Authority Board of Trustees. If Douglas' claim is valid, then he has been the victim of intolerable oppression and was certainly entitled to be appointed as Senior Engineer. For the public benefit as well as Douglas' benefit this matter should be thoroughly litigated in the trial court. The other dissenting justice, JUSTICE SHEARING, appears to see this point quite clearly.

The trial court has refused to hear Douglas' retaliation claim, namely, that the elimination of his job was "in retaliation of [his] coming forward and offering information concerning improprieties" ("inappropriate use of state and federal funds") engaged in by Airport Authority officials. In his brief, Douglas argues that the decisions of White and the Authority Board were arbitrary and capricious and in violation of his rights to due process of law. If Douglas has been deprived of his livelihood in the manner that he claims, then the Airport Authority was acting "[i]n violation of constitutional [and] statutory provisions" and "in excess of the statutory authority of the agency." NRS 223.135(3)(a), (b) and (f). If what Douglas claims is true, he is entitled to reinstatement independent of the order of reinstatement given to him by the Grievance Panel. It is sad indeed that no one will hear his plaint.

The trial court dismissed the "retaliatory lay-off" claim because it was not "addressed in the Board of Trustees' decision." The trial court is correct that the Board of Trustees did not

deal directly with the question of whether the Board had allowed the Airport Authority to be reorganized just to replace three "whistle-blowers." If I had been on the Authority Board, I suspect that I too would have been reluctant to deal with this very troublesome question; but I would not have expected to have been able to frustrate all judicial review of these charges simply by my refusing to consider them at the Board level.

I can understand how the trial court might not want to deal, in an administrative review, with contested matters of fact and with the collateral, *de novo* nature of Douglas' attack on the power of the Airport Authority to refuse to continue his employment for reasons of revenge and retaliation. This matter is, after all, a petition for judicial review, the statutory analogue of the common law writ of certiorari; and ordinarily matters *dehors* the record will not be entertained in such proceedings. But, we should ask ourselves, should this adjective consideration prevent Douglas from having any judicial inquiry into what he sees as the true reason for his losing his job? Where else can Douglas turn to redress his right not to lose his job simply because he tried to do the right thing?

In the case of State v. Lundgren Pacific Const. Co., Inc., 603 P.2d 889 (Wash. 1979), a highway contractor filed suit against the Department of Highways following a contractual dispute proceeding. The contractor sought judicial relief on the ground that it had been denied due process. The trial court refused to hear the *de novo* due process claim. The Supreme Court of Washington remanded to the trial court, ruling that "[i]f upon remand the trial court finds that the procedures of the Department of Highways failed to conform to the requirements of due process, either by their very nature or the manner in which these particular claims were handled, it will be necessary to furnish Lundgren with a fair hearing." *Id.* at 896.

I say that it is necessary, as in *Lundgren,* to furnish Douglas with a fair hearing on his due process claims. So far, he has had no one who will listen to the claimed atrocities that he insists caused him to be deprived of his livelihood. I would reverse the summary judgment and remand this case to the trial court for a trial *de novo* on Douglas' claim that he lost his job solely because he was seen by his superiors as a "whistle-blower." To do less than this is injustice in the extreme.

There are, as stated, two grounds for reversing the denial of Douglas' claims that he has been improperly denied employment. I would reverse on both grounds.

SHEARING, J., concurring in part and dissenting in part:

I agree with the majority regarding the reinstatement of Susan Clements. However, I disagree with the decision affirming the

termination of Douglas Clements because I believe that both the district court and the majority employed an incorrect standard of review.

The majority concludes that Douglas was properly terminated because he was not a civil servant. In reaching this conclusion, the majority adheres to the deferential "arbitrary or capricious" standard of review under the Administrative Procedure Act. I agree that this standard of review applies when the agency's decision is within its mandated jurisdiction and area of expertise. However, I believe that this standard of review should not be applied where a conflict of interest exists, such that its application is plainly unfair. This is such a case.

The employer here is accused of wrongfully terminating employees. That employer concluded that he properly terminated them. The deferential standard of review is inappropriate to a finding by an alleged wrongdoer that he did no wrong. The employer should stand in the same position as any other employer accused of wrongful termination. Simply because the employer is an agency does not mean that it is entitled to a deferential standard of review. Rather, as in other wrongful termination cases, the court should listen to the evidence and make an independent factual determination based on the applicable law.

In this case, not only did the employer terminate the Clements, but he overruled the grievance committee when its independent review resulted in a finding that the terminations were improper. The majority applies the deferential standard of review to this decision.

The Nevada Legislature never intended the Administrative Procedure Act to apply in a case like this. NRS 233B.020(1) sets out the legislative intent behind the Act:

> By this chapter, the legislature intends to establish minimum procedural requirements for the *regulation-making and adjudication procedure* of all agencies of the executive department of the state government and for judicial review of both functions. . . .

(emphasis added.) Terminating an employee is neither a regulation-making nor an adjudication function assigned to the Airport Authority of Washoe County; it is an internal management decision to which the Administrative Procedure Act does not apply. Once internal procedures have been followed, the available remedies and the applicable law should be the same as that in any other employer-employee dispute.

I would remand the case to the district court for a trial on the merits of Douglas Clements' allegations.